### UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF FLORIDA

#### CIVIL CASE NO. _____

| | |
|---|---|
| WESTON INSURANCE MANAGEMENT, LLC, a Florida limited liability company, | |
| Plaintiff, | |
| vs. | |
| MICHAEL CHRISTOPHER LYONS, and JOHN DOES 1-2, | |
| Defendants. | |

## COMPLAINT

Plaintiff, Weston Insurance Management, LLC ("Weston"), hereby sues Defendant, Michael Christopher Lyons ("Lyons"), and alleges:

## PRELIMINARY STATEMENT

1.      In 2011, Defendant Lyons formed Plaintiff Weston. In order to raise funds for the then nascent company, Lyons touted a proprietary algorithm ("Algorithm"), which he claimed was the "secret sauce" that would permit Weston to turn a profit by identifying and acquiring certain windstorm property insurance policies held by state-affiliated insurers of last resort. Investors provided millions of dollars in financing based on the promise of this Algorithm, which Weston used on countless occasions to try to build portfolios of profitable policies. This Algorithm was held in confidence and shared only (under an understanding of confidentiality) with a third-party software consultant, Treefrog Technology Group ("Treefrog"), who assisted Weston in developing and running the Algorithm against the voluminous pools of policies that Weston was analyzing. But in 2020, when Weston encountered financial difficulties, creditors took a controlling stake in

1

the Company.  Lyons, at the time still CEO and President of the Company, betrayed Weston by secretly creating a new company (Evercore), entering into a contract with Treefrog, and then purporting to place the Weston Algorithm under Evercore's control and restrict Treefrog's use of the Algorithm for Weston's business needs.  This brazen act of trade secret misappropriation and breach of duty of loyalty (among other wrongs) has resulted in Weston being unable to access its own proprietary Algorithm without paying an extortive license fee to Evercore—a company that has no legal interest in the Algorithm.

2.      Accordingly, Weston brings this action to prevent the theft of its Algorithm by Lyons and have it returned to Weston as its rightful owner.  Weston also seeks to prevent Lyons or any company controlled by Lyons, including Evercore, from using the Algorithm, which is Weston's proprietary and confidential information and which was entrusted to Lyons to hold in confidence and use for the exclusive benefit of Weston while employed by Weston.  Lyons violated his fiduciary duty and duty of loyalty owed to Weston as Weston's CEO when he formed a competing business to use Weston's proprietary information while still serving as Weston's CEO. Lyons has taken the Algorithm that Weston spent substantial sums of money funding, entered into competing contracts with Treefrog both as CEO of Weston and as the purported principal of Evercore, and has instructed Treefrog not to use the Algorithm for Weston's benefit.  In effect, Lyons has treated Weston as his own personal asset, refusing to recognize and acting directly contrary to the economic reality that what Weston funded and invested in, including Lyons' development efforts while employed by Weston, belongs to Weston and Weston alone.

3.      Weston seeks disgorgement of profits that Lyons has made as a result of the theft of the Algorithm, and any amounts by which Lyons was unjustly enriched.  Finally, Weston seeks to prevent Lyons from reaping the benefits of his breaches of the fiduciary and loyalty duties he owed

2

to Weston.  This includes, but is not limited to, the return of all compensation paid to Lyons during the time he was violating his duties to Weston.

## NATURE OF ACTION

4.      This action is based upon: (1) misappropriation of trade secrets under the federal Defend Trade Secrets Act; (2) misappropriation of trade secrets under the Florida Uniform Trade Secrets Act; (3) breach of fiduciary duty; (4) breach of duty of loyalty; (5) breach of contract; and (6) intentional interference with a business relationship.

5.      Weston provides windstorm insurance coverage for residential and commercial properties in Florida and other Gulf Coast states.  Weston was founded in 2011 by Lyons and others, and Lyons served as the Company's President and CEO from inception to February 22, 2021.

6.      Since 2012, Weston has used the proprietary optimization Algorithm at issue for analyzing insurance policies to determine which policies should be selected for assumption by Weston.  A core business of Weston's is to analyze and select property insurance portfolios for purchase or assumption, and utilization of the Algorithm is a critical component of that business. From 2012 to October 2020, Weston used the Algorithm on countless occasions for these purposes and, over the course of nearly a decade, Weston has expended significant amounts of money and resources in funding the use of equipment and services to run the Algorithm.

7.      The Algorithm was the foundation on which Weston was formed: it was the key to presentations made to investors to raise initial capital for the startup and to Weston's subsequent efforts to raise capital; it was used in connection with some of Weston's first portfolios of insurance policies; it formed the basis for Weston's applications to state-affiliated insurers to participate in certain programs for assuming existing policies and to thereafter analyze those existing portfolios in deciding whether to assume subsets of policies; it has been critical to Weston's process for

analyzing policies for assumption in states across the country; and it has allowed Weston to analyze the profitability of, and in certain cases ultimately acquire, portfolios of other insurance companies. In other words, the Algorithm has been one of Weston's "special sauces" since inception and the crux of its business.

8.      The Algorithm is what gives Weston an advantage when competing with other insurance companies for assumption or purchase of portfolios of insurance policies.  This is in part because the Algorithm drastically reduces the time to run an optimization on the types on portfolios Weston considers for assumption.  If the Algorithm was shared with other companies, Weston would lose this competitive advantage.

9.      As a result, details of the Algorithm are kept confidential, and Lyons' and other Weston employees' employment contracts included confidentiality and intellectual property terms that governed the disclosure and use of the Algorithm.

10.      Since its inception, Weston has consistently engaged Treefrog and/or Treefrog's founder and Lyons' former colleague, Dmitry Mnushkin ("Mnushkin"), to work with Weston to build the software platform and to run optimizations using the Algorithm. From 2012 to 2020, Treefrog and/or Mnushkin utilized the Algorithm exclusively for Weston to run optimizations against numerous pools of insurance policies Weston was analyzing for potential assumption—services for which Weston paid Treefrog a considerable sum of money each year. In November 2020, Lyons (on behalf of Weston) entered into a written contract with Treefrog, which, on information and belief, memorialized the terms governing Treefrog's provision of services to Weston that had been in place from the outset.

11.      In December 2020, Lyons received notice that his employment agreement was not being renewed, and he left Weston in February 2021.

12.     After Lyons' departure, Weston's new CEO requested that Treefrog run an optimization using Weston's Algorithm.  Mnushkin responded that Treefrog would first need permission from Lyons and his newly formed company, Evercore, to use the Algorithm for Weston, and that Evercore would only permit use of the Algorithm upon Weston's payment of a purported user or license fee to Evercore each time Weston wished to use it.  At the behest of Lyons, Treefrog ultimately declined to run the Algorithm for Weston without Weston agreeing to pay the demanded fee.

13.     Weston also learned from Treefrog that in September 2020, Lyons, on behalf of Evercore as its purported principal, and while still serving as Weston's President and CEO, had executed a contract with Treefrog, and that Evercore and/or Lyons had asserted ownership and exclusive rights to the Algorithm.  Prior to these discussions with Treefrog, Weston was entirely unaware that Lyons had formed a new company or that he had contracted with Treefrog and declared Weston's Algorithm as his own.

14.     On information and belief, Lyons is now believed to be engaged in fundraising for an underwriting entity that will compete against Weston using the Algorithm.

15.     Weston's business has been and continues to be harmed by Lyon's unlawful conduct and, as a consequence, it seeks relief from the Court to require Lyons to return to Weston its rightful property and to compensate Weston for damages already suffered.

## THE PARTIES

16.     Plaintiff Weston Insurance Management, LLC is a limited liability company organized and existing under the laws of Florida and registered in Florida with its principal place of business at 2555 Ponce de Leon Boulevard, Coral Gables, FL 33134.

17.     Defendant Michael Christopher Lyons is an individual and the former President and CEO of Weston with a last known address of 5817 Riviera Drive, Coral Gables, FL 33146.

18.     John Does 1-2 are entities owned and/or controlled by Lyons (or working in concert with Lyons) that have asserted ownership interest in the Algorithm, and whose names will be added to an amended complaint when identified through discovery.

## JURISDICTION AND VENUE

19.     This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and supplemental jurisdiction over Weston's state law claims pursuant to 28 U.S.C. § 1367.

20.     The conduct alleged in this Complaint occurred within, or Lyons directed his wrongful conduct towards, the County of Miami-Dade in the State of Florida.  Lyons' conduct, including the theft of Weston's intellectual property and the breach of his fiduciary and loyalty duties owed Weston as Weston's executive, occurred within and was directed towards the County of Miami-Dade, where Weston maintains its principal place of business and where Lyons' employment agreement specified as his place of employment.  Accordingly, jurisdiction and venue are proper within the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(a)(2) and (3).

21.     This Court has personal jurisdiction over Lyons because Lyons resides in the State of Florida and the acts and omissions complained of by Weston occurred in Florida.  Moreover, Lyons expressly consented in his employment agreement with Weston that the state and federal

courts located in the State of Florida shall have exclusive personal jurisdiction over any matter concerning Lyons' employment or arising from or relating to his employment agreement.

**LYONS' EMPLOYMENT AGREEMENT WITH WESTON**

22.      On May 1, 2012, Lyons and Weston executed an Executive Employment Agreement (the "Employment Agreement") governing the terms of Lyons' employment with Weston.  A true and correct copy of the Employment Agreement, to which Weston's Employee Handbook (the "Handbook") is appended as "Exhibit B," is attached to this Complaint as **Exhibit 1.**

23.      The Employment Agreement provides that Weston "employs [Lyons], and [Lyons] hereby accepts employment with the Company, on the terms set forth in this Agreement" and for a term commencing upon the receipt and acceptance by Weston Insurance Company, a Weston affiliate, of a Financial Strength Rating of "B" or higher, and ending three years after such date. Exhibit 1 ¶ 1(a).

24.      In addition to serving as President and CEO of Weston, Lyons was employed under the terms of the Employment Agreement to serve as President, CEO, and Chief Operating Officer ("COO") of Weston's affiliate, Weston Insurance Company, and as President, CEO, and COO of Weston Insurance Holdings Corporation ("Weston Holdings").  *Id.* ¶ 1(b).  As compensation and in consideration for these services, Lyons was promised, and in fact received, a salary in the amount of $ ▮▮▮▮▮ per year, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id.* ¶¶ 3-6 & Exhibit "A" to Employment Agreement.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 1(c).

25.      Weston, acting through its Board, reserved the right to terminate Lyons' Employment Agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



*Id.* ¶ 7.

26.    Lyons agreed in his Employment Agreement to ███████████

*Id.* ¶¶ 1(e)-(f).

27.    In addition to delineating Weston's Confidential Information and Intellectual Property policies, which are described in paragraphs 65-70 below, the Handbook defines serious misconduct by an employee to include, for instance, ███████████

*Id.* at Ex. B. The Handbook additionally requires ███████████

*Id.*

28.    Certain provisions of Lyons' 2012 Employment Agreement were subsequently amended on July 24, 2015 ("First Amendment"), February 22, 20216 ("Second Amendment"), and August 11, 2017 ("Third Amendment") (collectively, the "Amendments").  True and correct copies of the Amendments are attached as **Exhibit 2**.

29.    The Amendments replaced specified provisions of the 2012 Employment Agreement; the remaining unmodified 2012 provisions remained in full force and effect.  *See* Exhibit 2.  Among other things, the Amendments provided for ███████████

*Id.* (First Amendment ¶ 1). ███████████

*Id.* (Second Amendment ¶ 1).  The Amendments also ███████████

8

██████████████████████████████████████████████, *id.* (Third Amendment ¶¶ 1-2), and, as discussed in paragraphs 71-72 below, they replaced the 2012 Employment Agreement's Confidential Information provision with more robust terms, *id.* (First Amendment ¶ 8).

## WESTON AND ITS BUSINESS

30.     Founded in March of 2011, Weston is a focused insurance specialist that insures personal residential, commercial residential, and commercial non-residential properties for losses related to windstorms and hail, including hurricanes and tornadoes.

31.     Weston is a subsidiary of Weston Holdings, a privately held windstorm property insurance company formed in 2011 to address a lack of available coverage in the Gulf Coast states. Weston Holdings was founded by Lyons and operates commercially from Coral Gables, Florida.

32.     Weston was first admitted to write coverage in Florida, where in December 2012 Weston assumed its first policies through use of the Algorithm to choose a portfolio.  In addition to Florida, Weston is admitted to write coverage and insure properties in Texas as of May 2015, Alabama as of June 2015, Mississippi as of January 2016, and South Carolina as of May 2016.  In March 2020, Weston Holdings purchased Anchor Specialty Insurance Company, which has been renamed Weston Specialty Insurance Company ("WSIC").  WSIC is admitted to write insurance in thirteen states and has current homeowners programs in Texas and Louisiana, where WSIC is actively writing new and renewal business.

## WESTON'S PARTICIPATION IN STATE DEPOPULATION PROGRAMS

33.     To build and maintain its book of business, Weston participates in certain "Depopulation Programs" established by state-affiliated insurers of last resort, including Citizens Property Insurance Corporation ("Citizens") in Florida and the Texas Windstorm Insurance Association ("TWIA") in Texas.

34.     According to the Citizens and TWIA websites, the policy behind depopulation, as authorized by state legislatures, is to encourage more private insurance companies to write coverage in Gulf Coast states, thereby increasing the adequacy of the market and allowing greater freedom of choice for coastal residents who were previously limited to receiving coverage from state-created insurers of last resort.  Depopulation Programs facilitate coverage offerings by private insurance companies, which often offer more comprehensive protection than what insurers of last resort are capable of providing.  For example, because Citizens policyholders risk having to pay a significant assessment on their policy premiums if Citizens does not have the resources to pay claims following a major hurricane or series of storms, policyholders who move their policies to a private carrier can be subject to paying a much lower assessment amount.

### Florida's Depopulation Program

35.     In Florida, Weston participates in the Depopulation Program established by Citizens, a state-affiliated insurer that offers property coverage only when a policyholder cannot find coverage in the private market.  As required by Florida law, Citizens' Depopulation Program encourages Citizens policyholders to move their coverage to the private market, *i.e.*, to "depopulate" their policy from Citizens, and Citizens matches policyholders with private insurance companies interested in assuming policies from Citizens.

36.     Citizens policyholders with personal lines policies that are selected by more than one private company for assumption receive a Policyholder Choice Offer Letter from Citizens asking them to choose which company they would like to assume coverage of their property, or to opt-out of the assumption.  This Letter will list all available "Assumption Offers" by private carriers with their estimated renewal premiums, along with the estimated renewal premium for the Citizens

policy.  An insurance company's Assumption Offer is an offer to assume the coverage and liabilities of a policyholder's policy during a given Depopulation Cycle.

37.     For commercial lines policies selected by more than one private company for assumption, Citizens uses an algorithm to distribute the policies among the various private companies so that the commercial policyholder only receives an offer from one private company. Unlike policyholders of personal lines policies and commercial residential lines policies, commercial nonresidential policies are not eligible to opt out of an assumption.

### Texas' Depopulation Programs

38.     Weston participates in similar depopulation programs in Texas, where TWIA has two programs in place to encourage TWIA policyholders to move their windstorm coverage to the private market: the Assumption Reinsurance Depopulation Program and the Voluntary Market Depopulation Program.  Weston participates in both of these programs.

#### TWIA's Assumption Reinsurance Depopulation Program

39.     According to the TWIA website, the initial goal of the TWIA Assumption Reinsurance Depopulation Program is for a private market insurance company like Weston to "step into the shoes" of TWIA on a fixed date and become the responsible insurer on a group of TWIA policies selected by the private carrier.  Then, as each of the TWIA policies assumed by the private carrier reaches its regular renewal date, the private carrier (instead of TWIA) directly generates the renewal policy, which completes the move of the policyholder to the private market carrier and is the ultimate goal of the program.

40.     To participate in the Assumption Reinsurance Depopulation Program, Weston and competing private insurance companies are required to submit to TWIA a list of selected policies they wish to assume by a stated deadline.  TWIA then makes these policy selection lists available

for review by the insurance agent for each policy.  Selected TWIA policyholders are notified prior to the assumption of their insurance policies and they have a six-month period, from December 1 to May 31, to elect to opt out of the private-carrier assumption and remain with TWIA.

41.     If the policyholder does not opt out of the assumption during the six-month period, then the policy will be assumed by the private company.  During the period after a policyholder's TWIA policy is assumed, starting on June 1, but before the private carrier issues one of its policies, the private carrier is responsible for handling all claims on the policy while TWIA continues to handle the policy administration (*e.g.*, processing any updates or changes to coverage and accepting premium payments).  Once the private company issues its policy, the company then becomes responsible for servicing all aspects of the policy, including policy administration and claim handling.

42.     Additionally, during the six-month period that selected TWIA policyholders have to opt out of the assumption, private insurance companies, including Weston, will enter into a reinsurance agreement with TWIA whereby each private company reinsures TWIA 100% for the policies the company selected.  For a policyholder that elects to opt out of the assumption, the policyholder's policy will be retroactively removed from this reinsurance agreement back to the beginning of the six-month period.

### TWIA's Voluntary Market Depopulation Program

43.     Weston also participates in TWIA's Voluntary Market Depopulation Program.

44.     As part of the Voluntary Market Depopulation Program, private market carriers identify properties insured by TWIA they would like to insure and make coverage offers to the TWIA policyholders for those properties prior to the natural renewal date of their TWIA policies. The goal of this program is for the TWIA policyholders who receive a coverage offer to move their

12

coverage to the private carrier when their TWIA policy expires rather than renewing their policy with TWIA.

45.     Policyholders who receive an offer of coverage control the decision as to whether to accept the offer and move their coverage to the private market carrier or remain with TWIA.

### WESTON'S CONFIDENTIAL AND PROPRIETARY ALGORITHM

46.     Since Weston's founding, and continuing over the course of nearly a decade, the Algorithm has been integral to Weston's business of analyzing property insurance portfolios for assumption, and Weston has routinely used the Algorithm to identify a subset of policies that would create a profitable portfolio if assumed.

47.     The existence of the Algorithm was a significant factor in Weston's ability to raise initial capital and in its subsequent efforts to raise capital. It allowed Weston to build its initial portfolio of policies in 2012, when Weston used the Algorithm to analyze the Citizens portfolio to create a target list of policies to assume from Citizens in Florida. Weston then successfully employed the Algorithm to become a private market participant in the TWIA Depopulation Programs to assume numerous additional policies in Texas. Until its access was restricted in 2021, Weston continued to routinely use the Algorithm to run optimizations and evaluate the profitability of assuming numerous portfolios of policies from both Citizens and TWIA. For example, Weston recently was able to target a substantial amount of business through participation in the TWIA Voluntary Market Depopulation Program by running the Algorithm, which identified over $64 million in premiums for Weston to target. Finally, outside the context of depopulation, the Algorithm has played a key role in Weston's process for analyzing portfolios for acquisition and purchase in states across the country.

48.     The Algorithm was developed while Lyons was employed by Weston.  At or around the time Weston was founded in 2011, Lyons selected Mnushkin, and eventually Treefrog upon its founding by Mnushkin in 2013, as the third-party vendor to work with Weston to build, maintain, and run optimizations on the Algorithm for Weston's projects.  Lyons and Mnushkin are close former colleagues who worked together immediately prior to Lyons founding Weston.

49.     For the next decade, Weston engaged Mnushkin and Treefrog to work with Weston using the Algorithm, which Mnushkin and Treefrog operated for Weston alone.  Treefrog was required to treat the Algorithm as confidential to Weston, and it was not permitted to use the Algorithm in its dealings with any other business entity.  Indeed, until Weston's access was suddenly restricted in 2021, use of the Algorithm was entirely funded by Weston, which has paid Treefrog considerable sums of money since inception to run the Algorithm for Weston's regularly conducted business.

50.     Weston has expended substantial resources on (i) equipment (*e.g.*, servers) that have the processing capacity to run the Algorithm; and (ii) services from Mnushkin and then Treefrog to actually run the Algorithm itself.  For example, each time an optimization needs to be run to evaluate a portfolio, Weston funds the computer equipment required for Treefrog to use the Algorithm, which alone costs thousands of dollars.  And, in a given year, Weston often pays Treefrog hundreds of thousands dollars for its provision of services related to Weston's proprietary algorithms.

51.     Before it was restricted access to its own Algorithm, Weston would supply insurance portfolio and modeling data for certain projects to Treefrog requesting that Treefrog run optimizations using the Algorithm.  Among other projects, Treefrog routinely ran the Algorithm for Weston in connection with the Citizens and TWIA Depopulation Programs in Florida and Texas.

14

For example, in 2020 alone, Weston's utilization of the Algorithm allowed it to execute Florida assumptions for a total actual assumed premium amount of $10.3 million.

52.     The Algorithm, and Treefrog's ability to run the Algorithm, have been essential both to Weston's ability to assume policies from Citizens and TWIA, and to its ability to meet Depopulation Program deadlines.  For example, as part of Weston's participation in the Citizens Program, which requires that private insurers abide by a strict regulatory timeline, Weston is required to submit an application to assume certain Citizens policies.  To do so, Weston must meet two deadlines.  Implementation of the Algorithm has been critical to meeting each of these deadlines.  By the first deadline, Weston provides Citizens with information about how many Citizens policies Weston wishes to assume.  To meet this deadline, once Weston receives notification that the initial data file with information about all Citizens policies is available and all catastrophe modeling is done, Weston's management directs Treefrog to run the Algorithm and provide results about different groups of policies that could be added to Weston's portfolio with various metrics for the combined portfolio. By the second deadline, Weston submits to Citizens a list of which specific policies Weston wishes to assume.  To meet this second deadline, upon receipt of the final data file, Weston provides Treefrog with permutations and data about the number of policies at certain premiums it is targeting, and Treefrog runs optimizations with the Algorithm. The results then guide Weston's final determination of Citizens policies it will offer to assume.

53.     Outside the context of depopulation, the Algorithm, and Treefrog's services in connection with the Algorithm, are critical to Weston's assessment of the profitability of portfolios of acquisition targets and its ultimate determination whether to purchase the portfolio of another insurance company.  For example, the Algorithm contributed to the successful acquisition of Anchor Specialty Insurance Company in 2020.

15

54.     In short, the Algorithm has been one of Weston's "special sauces" since inception and has continued to play a critical role in Weston's ability to compete with other insurance companies in the assumption or acquisition of insurance portfolios.  Indeed, Weston's competitive advantage is due in large part to the Algorithm, which drastically reduces what would otherwise take a protracted time to run an optimization on a portfolio.  Were the Algorithm to be shared with others, Weston would lose this competitive advantage.

55.     As a result, Weston has taken measures to protect the Algorithm from use by or disclosure to others.  Treefrog is the only third-party vendor that has access to the Algorithm and, as reflected in Weston's agreement with Treefrog, it is required to maintain the Algorithm as confidential.

### Lyons Acknowledges that the Algorithm is Weston's Intellectual Property

56.     On multiple occasions, Lyons has acknowledged that the intellectual property used in the conduct of Weston's business, including algorithms developed by Lyons, were Weston's property.  As President and CEO, Lyons represented to other entities with which he engaged on behalf of Weston that there were no outstanding claims of any kind relating to Weston's intellectual property and that Weston was not bound by any license or agreement with respect to trade secrets, licenses, information, proprietary rights, and processes of any other person.  Notably, and as explained below, Lyons, on behalf of Weston, specifically agreed with a Weston investor that Weston had rights to any intellectual property owned by Lyons and used in connection with Weston's business, including algorithms, in order to ensure that in the event Lyons is no longer CEO of Weston, Weston retains those rights.

16

57.     For example, in 2014, Lyons, on behalf of Weston, executed a Preferred Stock Purchase Agreement between Weston and Transatlantic Reinsurance Company ("Transatlantic Agreement").  A true and correct copy of the Transatlantic Agreement is attached as **Exhibit 3**.

58.     Lyons, on behalf of Weston, or "the Company," agreed to the following provision in the Transatlantic Agreement:



Exhibit 3 (emphasis added).

59.     In 2016, Lyons signed a Senior Debt Loan Agreement between Weston and Canopius Services Limited ("Canopius Agreement").  A true and correct copy of the Canopius Agreement is attached as **Exhibit 4**.

60.     In Section 5.05(b) of the Canopius Agreement, Lyons, on behalf of Weston, "the Borrower," agreed that:



Exhibit 4 (emphasis added).

17

61.     And in Section 7.14 of the Canopius Agreement, entitled "Intellectual Property," Lyons, on behalf of Weston, as the "Borrower," agreed that



*Id.* (emphasis added).

62.     In 2018, Lyons executed a Preferred Stock Purchase Agreement between Weston and HSCM Bermuda Fund ("HSCM Agreement").   A true and correct copy of the HSCM Agreement is attached as **Exhibit 5**.

63.     Lyons, on behalf of Weston, the "Company," agreed to the following in the HSCM Agreement:



Exhibit 5 (emphasis added).

## WESTON'S EFFORTS TO PROTECT ITS ALGORITHM

64.    Weston takes the protection of its intellectual property seriously and, during all relevant periods, took reasonable steps to protect the secrecy of its trade secrets and other confidential information, including the Algorithm.  These steps include:

    a.  Requiring employees to execute an agreement governing the use and disclosure of Weston's confidential information and intellectual property.

    b.  Requiring employees to agree to the terms of an employee handbook, which is incorporated into and attached to all employee agreements, and which includes terms dictating the use, disclosure, and protection of Weston's confidential information and intellectual property that all employees must review and consent to in accepting and continuing their employment with Weston.  A breach of these terms is cause for termination.

    c.  Limiting access to confidential and trade secret information to those with a legitimate business interest need to know.

    d.  Requiring contractors, *e.g.*, Treefrog, in connection with its use of the Algorithm, to agree to protect Weston's confidential information and intellectual property.

    e.  Maintaining the physical security of offices, including badge-restricted access and for any visitor to be accompanied by a Weston employee.

    f.  Maintaining Company network restrictions with passwords and double authentication methods to access Weston equipment and servers and requiring all Weston business to be done in a secure environment, including on the secure Citrix platform when an employee is working remotely.

19

65.     For example, Weston requires its employees to sign written contracts agreeing to certain confidentiality and protection of intellectual property terms, which require that employees keep proprietary and trade secret information confidential and not use or disclose such information outside the context of work for and on behalf of Weston.  Weston additionally provides notice to all employees of these terms in its Handbook.  *See* Exhibit 1 (Ex. B to Employment Agreement).

66.     Lyons was no exception.  Lyons' May 1, 2012 Employment Agreement incorporated by reference the Handbook, including any updates to the Handbook in the course of his employment.   The 2012 Handbook attached to Lyons' Employment Agreement included the following provision:



Exhibit 1 (Ex. B).

67.     In the same section, the Handbook warns of the consequences of a violation or threatened violation of the Intellectual Property policy:



20

████████████████████████████

*Id.*

68.    Weston also requires that employees agree to ███████████████████
████████████████████████████████  The Handbook
attached to Lyons' Employment Agreement provides that ████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████  *Id.*

69.    As with violations of the Intellectual Property provision, the Handbook also
contemplates violations of the Confidential Information policy.  Weston's employees agree as a
term of their employment that ██████████████████████████████
████████████████████████████████████████
████  *Id.*  Thus,

████████████████████████████████

*Id.*

70.    Lyons was also bound by these confidentiality terms in the Handbook, including any
updates to the Handbook, during all relevant periods of his employment with Weston.  For example,
Paragraph 10 of Lyons' 2012 Employment Agreement required Lyons, and Lyons agreed, ██

████████████████████████████████████████████████

████████ the Handbook.  *Id.*  And Lyons agreed ████████████████████████████

████████████████████████████████████████████████

████████████████████████████ *Id.*

    71.    Lyons re-affirmed his commitment to keeping Company matters confidential ████

████████████████████████████████████████████████

████████ in the 2015 First Amendment, where he agreed as follows:



Exhibit 2 (emphasis added).

    72.    The First Amendment specifically defines matters that are ████████████

████████████████████████████████ which ████████████████

████████████████████████████ such that ████████████

████████████████████████ of Lyons' Employment Agreement.  *Id.*  Those matters,

which ████████████████████████████ include:

*Id.* (emphasis added).

73.    As another example of Weston's measures to protect its confidential information and intellectual property, Weston executes non-disclosure and confidentiality requirements with its third-party vendors.  For example, Weston has executed non-disclosure requirements in its Master Contractor Services Agreement ("MSA") with Treefrog.  A true and correct copy of the Treefrog MSA attached as **Exhibit 6**.

74.    Article 14.1 of the MSA states that the parties ██████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Exhibit 6.  The MSA defines ██████████████████████████████:

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

*Id.*

75.    Article 14.2 of the MSA provides that ████████████████████████ ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ *Id.*  It further provides that ███████████████████████

████████████████████████ and that ████████████████████████

████████████████████████████████████████████████████

██████████████████████ *Id.*

## DEFENDANT'S MISCONDUCT

76.     On December 23, 2020, Weston notified Lyons in writing that it would not renew his term of employment, which would expire on February 22, 2021 (the "Expiration Date").  A true and correct copy of the December 23, 2020 Notice of Non-Renewal is attached as **Exhibit 7**.

77.     The Notice of Non-Renewal informed Lyons that ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ Exhibit 7.

78.     The Notice also specifically reminded Lyons of his ████████████████

████████████████████████████████████████████████████

████████████████████████ and of ████████████████████████

████████████████████████████████████████████████████

██████████████████████ *Id.* (emphasis added).  As Weston would discover, however, Lyons chose to disregard the duties he owed Weston.

79.     When negotiating Lyons' exit papers, Lyons specifically objected to the term governing his prohibited disclosure and use of Weston's intellectual property.

80.     On June 7 and 8, 2021, Weston's new CEO (Lyons' successor) exchanged several emails with Mnushkin requesting that Treefrog run the Algorithm for a new project of Weston's. Before agreeing to run the Algorithm, as Treefrog and Mnushkin had done for the last decade for Weston, Mnushkin informed Weston that Treefrog would first have to get permission to use the Algorithm for Weston.  Weston responded to Mnushkin that the Algorithm was Weston's property and that Weston disagreed with the sudden stated need to obtain third-party permission to use the Algorithm.  Mnushkin responded on June 9, 2021: "I've spoken with Michael and given Weston's position that the algorithm is Weston property, he feels that at this time he cannot grant permission for Treefrog to use the optimization algorithm."

81.     In a separate exchange around the same time, Mnushkin additionally informed Weston that in September 2020, Lyons, on behalf of an entity called Evercore, had executed a contract with Treefrog, and that Lyons and/or Evercore had asserted ownership in and exclusive rights to the Algorithm and had required Treefrog to obtain permission prior to any use of the Algorithm.  Treefrog indicated that any use of the Algorithm by Weston would require payment of a license fee to Evercore.  According to Treefrog, the principal of Evercore is Lyons.

82.     One information and belief, Lyons was still employed by Weston and serving as Weston's President and CEO when he apparently formed Evercore and purported to execute a contract with Treefrog on Evercore's behalf.

83.     Weston, which was not aware of the existence of any contract between Treefrog and Lyons or Evercore (or that Lyons had founded Evercore), requested a copy of the contract between Treefrog and Evercore.   However, Treefrog refused Weston's request, citing apparent nondisclosure provisions in the contract.

84.     In light of Lyons' and Evercore's false assertion of ownership over the Algorithm and Lyons' refusal to grant Treefrog permission to use the Algorithm for Weston, Treefrog has refused to run the Algorithm for Weston projects.

85.     Without access to the Algorithm, Weston's ability to conduct its business is being actively and significantly impaired.  Weston is prevented from engaging in its regularly conducted business of evaluating and assuming portfolios based on the Algorithm—a core of its business.

86.     Lyons' conduct in restricting Weston's access to its own Algorithm has additionally forced Weston to forego submission of applications to assume Citizens policies, which has long been an important source of new business income for Weston.  And Weston is about to miss additional deadlines for submitting applications to assume Citizens policies, including an impending end-of-December deadline as well as a February deadline with the Florida Office of Insurance Regulation to approve depopulations from Citizens.

87.     Indeed, because Weston has been completely cut off from using its proprietary Algorithm, Weston has not been able to participate in **any** assumptions in 2021.

88.     On information and belief, Lyons is now engaged in fundraising for an underwriting entity that will compete against Weston using the Algorithm.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Misappropriation Of Trade Secrets Under Defend Trade Secrets Act

### (18 U.S.C. § 1836)

89.     Weston incorporates the allegations of paragraphs 1 through 88 as if fully set forth herein.

90.     As set forth above, Weston owns trade secret information related to the Algorithm.

91.     The Algorithm is intended for use in interstate commerce as it is employed to determine which insurance policies covering properties in several states, and portfolios of policies held by insurers in various states, should be assumed by Weston.

92.     The Algorithm was developed, refined, and improved at significant expense and over the course of years by individuals employed at Weston, including by Lyons while he was employed at Weston.

93.     The Algorithm is highly valuable to Weston in the conduct of Weston's business, and Weston relies on the secrecy of this information to maintain its competitive advantage.  As set forth above, the Algorithm gives Weston a business advantage or opportunity for a business advantage over others who do not know or use the Algorithm.  Indeed, since the theft of its Algorithm, Weston has suffered and continues to suffer from a loss of business and loss of competitive advantage.

94.     Weston, at all relevant times, undertook reasonable steps to safeguard its trade secrets and other confidential and proprietary information, including that related to the Algorithm.  As set forth above in paragraphs 64 through 75, Weston takes reasonable steps to protect the secrecy of its trade secrets, including the Algorithm, through measures that include physical, electronic, and contractual security.

95.     While employed by Weston, Lyons knew that Weston's techniques, trade secrets, and data related to the Algorithm were to remain confidential and were the exclusive property of Weston.

96.     Lyons misappropriated Weston's trade secrets intentionally and knowingly, by improper means, and with a deliberate intent to benefit himself and injure Weston in the manner described above.  Since leaving Weston, Lyons has purported to be engaged in fundraising for a

new business enterprise in order to compete with that of Weston, and has converted Weston's trade secrets to aid in that competition.

97.     Lyons' misappropriation of Weston's trade secrets was willful and malicious.  Lyons knew that the trade secrets belonged to Weston, and that by wrongfully claiming exclusive rights to the information, Weston would lose the competitive advantage that the Algorithm afforded it. Indeed, when negotiating Lyons' exit papers, Lyons specifically objected to the term governing his prohibited disclosure and use of Weston's intellectual property.   And Lyons willfully and maliciously sought to prevent Weston from utilizing its own intellectual property without paying a "user" or license fee to Lyons and/or Evercore.

98.     Lyons violated and continues to violate the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, by converting, claiming exclusive rights to, and altogether precluding Weston's access to Weston's trade secrets.

99.     Lyons' misappropriation of Weston's trade secrets has caused and continues to cause Weston substantial and irreparable injury.

100.     As a direct and proximate result of Lyons' unauthorized disclosure and misappropriation of Weston's trade secrets, Weston has suffered, and will continue to suffer, damages in the form of lost income, profits, and business opportunities.

101.     Weston is entitled to injunctive relief to prevent actual and threatened misappropriation by Lyons, to an award of damages for actual loss and for unjust enrichment caused by the misappropriation, and to an award of exemplary damages and attorney's fees under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

**SECOND CAUSE OF ACTION**

**Misappropriation Of Trade Secrets Under Florida Uniform Trade Secrets Act**

28

**(§§ 688.001, *et seq.*, Fla. Stat.)**

102.    Weston incorporates the allegations of paragraphs 1 through 88 as if fully set forth herein.

103.    As set forth above, Weston owns trade secret information related to the Algorithm.

104.    The Algorithm constitutes a "trade secret" under the definition contained in Section 688.002(4) of the Florida Statutes.  As set forth above, the Algorithm derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and it is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

105.    The Algorithm is highly valuable and critical to Weston's business.  The Algorithm gives Weston a business advantage or opportunity for a business advantage over others who do not know or use the Algorithm.  Indeed, since the theft of its Algorithm, Weston has suffered and continues to suffer from a loss of business and loss of competitive advantage.

106.    As set forth above in paragraphs 64 through 75, Weston takes reasonable steps to protect the secrecy of its trade secrets, including the Algorithm, through measures that include physical, electronic, and contractual security.

107.    The Algorithm was created, refined, and improved at significant expense and over the course of years by individuals employed at Weston, including by Lyons while he was employed at Weston.

108.    While employed by Weston, Lyons knew that Weston's techniques, trade secrets, and data related to the Algorithm were to remain confidential and were the exclusive property of Weston.

109.    Lyons also expressly agreed in his Employment Agreement that ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Exhibit 2.

110.    Lyons was obligated during the course of and after his employment with Weston to maintain the secrecy of the confidential matters learned by Lyons, including Weston's techniques, trade secrets, and data related to the Algorithm.

111.    Despite this obligation, Lyons breached his duty to maintain the secrecy of Weston's trade secrets.

112.    Lyons, acting alone and through his new company Evercore, has stolen confidential and secret information acquired by Lyons during the course of his employment with Weston.  Lyons has converted the information for his own purposes, to the prejudice of Weston and its business of assuming insurance policies through use of the Algorithm.

113.    Lyons misappropriated Weston's trade secrets intentionally and knowingly and with a deliberate intent to benefit himself and injure Weston.  Lyons knew that he had a duty to maintain the secrecy of Weston's trade secrets, which he ████████████████████████████

████████████████████████████████████████ Despite that duty, Lyons formed a new company that he intended would compete with Weston and would use the Algorithm that Weston has spent a vast sum of money developing and implementing.  Lyons did so while still employed by Weston and while he was serving as Weston's top executive.

114.    Lyons' misappropriation of Weston's trade secrets was willful and malicious.  Lyons knew that the trade secrets belonged to Weston, and that by wrongfully claiming exclusive rights

to the information, Weston would lose the competitive advantage that the Algorithm afforded it. Indeed, when negotiating Lyons' exit papers, Lyons specifically objected to the term governing his prohibited disclosure and use of Weston's intellectual property.  As set forth above, Lyons willfully and maliciously sought to prevent Weston from utilizing its own intellectual property without paying a "user" or license fee to Lyons and/or Evercore.

115.    Lyons' misappropriation has caused and continues to cause Weston substantial injury, including damage to Weston's business and business interests.

116.    Lyons' actions have resulted, and continue to result, in Lyons' unjust enrichment. Unless restrained, Lyons will continue to be unjustly enriched to Weston's prejudice and damage.

117.    Weston is entitled to injunctive relief to prevent actual and threatened misappropriation by Lyons, to an award of damages for actual loss and unjust enrichment caused by the misappropriation, and to an award of exemplary damages and attorney's fees under the Florida Uniform Trade Secrets Act, §§ 688.003-.005, Fla. Stat.

### THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty

118.    Weston incorporates the allegations of paragraphs 1 through 88 as if fully set forth herein.

119.    Lyons, as Weston's most senior executive officer, owed Weston fiduciary duties of fair dealing, loyalty, and care, and had an obligation to act with the utmost good faith, fairness, and honesty for Weston's benefit.  Weston was entitled to and did place its confidence and trust in Lyons, and Lyons accepted that confidence and trust.  Lyons' fiduciary duties are not based in contract and they extended beyond his employment term.

120.     Both during and after Lyons' employment with Weston, Lyons additionally had a duty not to use, without Weston's consent, confidential information acquired during the course of Lyons' employment, which includes the Algorithm that is proprietary and confidential information of Weston and that was entrusted to Lyons to hold in confidence and use for the benefit of Weston.

121.     Through the actions set forth above, including Lyons' efforts to further his new business, which he formed *while still serving as Weston's President and CEO*, Lyons knowingly and willingly breached his ongoing fiduciary duties to Weston.

122.     Lyons has formed a competing company with Weston and, without the consent of Weston and to Weston's detriment, has claimed exclusive rights to Weston's confidential and trade secret information, including the Algorithm, which Lyons helped develop during the course of his employment with Weston.  Lyons' scheme seeks to exclude Weston from the use of its own confidential and trade secret information as Lyons has falsely claimed Weston's Algorithm to belong to him and/or Evercore.

123.     Indeed, when negotiating Lyons' exit papers, Lyons specifically objected to the term governing his prohibited disclosure and use of Weston's intellectual property.

124.     As a direct and proximate result of Lyons' breach of his fiduciary duties, Weston has suffered and continues to suffer irreparable harm.

125.     Weston is entitled to damages as a result of the actions and conduct of Lyons alleged herein, including, but not limited to, the return of the compensation Weston paid to Lyons during the time he was violating his fiduciary duties to Weston.

### FOURTH CAUSE OF ACTION

### Breach of Duty of Loyalty

126.    Weston incorporates the allegations of paragraphs 1 through 88 as if fully set forth herein.

127.    As Weston's executive and employee, Lyons owed Weston a common law duty not to engage in disloyal acts in anticipation of future competition, including through the conversion of confidential information acquired in the course of Lyons' employment to his own advantage and to the detriment of Weston.

128.    Weston was entitled to place its trust and confidence in Lyons and was entitled to expect Lyons, as the senior most executive officer, to act with the highest degree of loyalty in carrying out Weston's business.  Weston relied on Lyons' loyalty and integrity and faithful performance of his job duties and responsibilities.

129.    Through the actions set forth above, including his efforts to further his new and competing business, Lyons knowingly and willingly breached his common law duty of loyalty to Weston.

130.    As a direct and proximate result of Lyons' breach of his duty of loyalty to Weston, Weston has suffered and continues to suffer irreparable harm.

131.    Weston is entitled to damages as a result of the acts and conduct of Lyons alleged herein, including, but not limited to, the return of the compensation Weston paid to Lyons during the time he was violating his duty of loyalty to Weston.

## FIFTH CAUSE OF ACTION

### Breach of Contract

132.    Weston incorporates the allegations of paragraphs 1 through 88 as if fully set forth herein.

133.     As set forth above, Lyons and Weston entered into a written Executive Employment

Agreement on May 1, 2012, and executed several Amendments to that Agreement in the course of

Lyons' employment with Weston.  Pursuant to the express terms of his Employment Agreement,

both before and after it was amended, Lyons was ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████

134.     By  the  express  terms  of  his  Employment  Agreement,  as  amended,  Lyons'

contractual duties relating to ██████████████████████████████████████████████████

████████████████████████████████████████ Lyons agreed that he would

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Exhibit 2

(First Amendment ¶ 8) (emphasis added).

135.     Lyons  further  agreed  that  ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.* (emphasis

added).   In  addition,  Lyons  agreed  that  the  aforementioned  items  are  ████████████████

████████████████████████████████████████ which ████████████████████████████

████████████████████████████████ **such that** ██████████████████████████████

████████████████████████████████████ **of Lyons' Employment Agreement**.   *Id.*

(emphasis added).

34

136.    The written agreements, mutually agreed upon by Weston and Lyons and for valuable consideration, were valid and binding.

137.    Weston performed all duties required of it under the above-referenced agreements.

138.    Weston's contractual protections of its confidential information from misuse is a legitimate business interest.  Weston seeks to protect and enforce the misuse and non-disclosure of its trade secrets and its valuable confidential business or professional information, including that related to the Algorithm, which is critical to the effective and successful conduct of Weston's business.  Indeed, Lyons expressly agreed that ████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████  *Id.*

139.    Lyons breached his Employment Agreement, as set forth above, when he took and withheld the Algorithm from Weston for his personal use and gain and/or the use and gain of Evercore, an entity he controls, made the Algorithm accessible to Evercore, and demanded that Weston pay him and/or Evercore a fee to use the Algorithm.

140.    As a direct and proximate result of Lyons' breach, Weston has suffered monetary damages in the form of lost income, profits, and business opportunities.

141.    Weston has been and continues to be irreparably harmed by Lyons' violations of the enforceable restrictive covenants in his Employment Agreement, which creates a presumption of irreparable injury and entitles Weston to appropriate injunctive relief to remedy the ongoing violations.

## SIXTH CAUSE OF ACTION

### Intentional Interference with a Business Relationship

142.    Weston incorporates the allegations of paragraphs 1 through 88 as if fully set forth herein.

143.    Lyons engaged in tortious activity when he instructed Treefrog to not run the Algorithm for the benefit of Weston.

144.    Between around 2011 and 2020, Treefrog or its President had run the Algorithm on countless occasions, each time for Weston's exclusive benefit.

145.    As CEO and President of Weston, Lyons was aware of the ongoing business relationship between Weston and Treefrog.  Indeed, Lyons himself selected Treefrog as Weston's vendor and he signed the MSA between the parties.

146.    With knowledge of Weston's ongoing business relationship with Treefrog, Lyons intentionally and unjustifiably interfered with that business relationship by seeking to preclude Weston from having Treefrog run Weston's Algorithm without paying a "user" or license fee to Lyons and/or Evercore to use the Algorithm.

147.    As set forth above, Lyons' conduct was intentional, wilful, malicious, wanton, and egregious.

148.    As a result of Lyons' interference with Weston's business relationship with Treefrog, Weston has suffered and will continue to suffer damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Weston respectfully requests that judgment be entered in favor of Weston and against Lyons and prays for the following relief:

a)      A preliminary and permanent injunction restraining Lyons from further disclosing or using Weston's confidential and trade secret information, including but not limited to the Algorithm.

b)      A preliminary and permanent injunction restraining Lyons from claiming or exercising any right to the Algorithm.

c)      A preliminary and permanent injunction requiring Lyons to immediately surrender the Algorithm to Weston and restraining Lyons from restricting Treefrog's engagement with Weston in connection with the Algorithm.

d)      Monetary damages in an amount equal to the actual losses sustained by Weston as a result of Lyons' direct or indirect use of Weston's confidential and secret information.

e)      An accounting of Lyons' profits and monetary damages in an amount equal to any such profits realized by Lyons as a result of the misappropriation of Weston's trade secrets that are not taken into account in computing Weston's actual losses.

f)      Exemplary damages for Lyons' willful and malicious misappropriation of Weston's trade secrets pursuant to Section 688.004 of the Florida Statutes and 18 U.S.C. § 1836.

g)      Punitive damages under Florida law for Lyons' egregious, wanton, and malicious interference with a business relationship.

h)      Attorney's fees pursuant to Section 688.005 of the Florida Statutes and 18 U.S.C. § 1836, costs of suit, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Weston demands a trial by jury of all issues so triable.

Dated: December 15, 2021          Respectfully submitted,

/s/ Martin B. Goldberg
Martin B. Goldberg
Florida Bar No.: 0827029
LASH & GOLDBERG LLP
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131
mgoldberg@lashgoldberg.com
Telephone: 305-347-4040
Facsimile: 305-347-4050

Lee H. Rubin
lrubin@mayerbrown.com
Michael A. Molano
mmolano@mayerbrown.com
Olaniyi Solebo
osolebo@mayerbrown.com
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306
Telephone: (650) 331-2000
Facsimile: (650) 331-2060

*Pro Hac Vice* applications to be filed

Kathryne M. Gray
MAYER BROWN LLP
700 Louisiana Street, Suite 3400
Houston, TX 77002
kgray@mayerbrown.com
Telephone: (713) 238-3000
Facsimile: (713) 238-4888

*Pro Hac Vice* application to be filed

*Counsel for Plaintiff*
*Weston Insurance Management LLC*